Christopher Sproul (Cal. Bar No. 126398)
Stuart Wilcox (Cal. Bar. No 327726)
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695
Email: csproul@enviroadvocates.com

Lauren Chase (Cal. Bar No. 324162)
ORANGE COUNTY COASTKEEPER
3151 Airway Ave., Suite F-110
Costa Mesa, California 92626
Telephone: (714) 850-1965
Email: lauren@coastkeeper.org

Attorneys for Plaintiff
ORANGE COUNTY COASTKEEPER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORANGE COUNTY COASTKEEPER, a California non-profit corporation, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES ARMY CORPS OF ENGINEERS and SCOTT A. SPELLMON, in his official capacity as the Chief of Engineers and Commanding General of the United States Army Corps of Engineers, <br><br> Defendants. | Civil Case No. 23-507 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Orange County Coastkeeper ("Coastkeeper"), by and through counsel, hereby alleges as follows:

## INTRODUCTION

1.      Through this Complaint, Plaintiff Orange County Coastkeeper ("Coastkeeper") sues Defendant U.S. Army Corps of Engineers ("the Corps") for its violations of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531, *et seq.*; National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*; and Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, *et seq.*, related to the Lower Newport Bay Maintenance Dredging Project ("Project") and for the Corps' additional violations of NEPA and the APA for related actions, including previous dredging of Lower Newport Harbor and permitting of the confined aquatic disposal ("CAD") facility.

2.      Among other remedies, Coastkeeper seeks an order declaring that the Corps' failure to engage in ESA section 7 consultation before authorizing the Project through the Corps' Final Environmental Assessment for the Lower Newport Bay Maintenance Dredging Project ("Final EA") and related Finding of No Significant Impact ("FONSI") and setting forth criteria for the Project through the Final EA and FONSI was a violation of the ESA and an injunction preventing the Corps from beginning dredging or taking any other actions as part of the Project unless and until it initiates and completes ESA section 7 consultation on the effects of those and any other related actions.

3.      Coastkeeper also seeks an order holding the Corps' Final EA and FONSI unlawful and setting them aside, *i.e.* vacating them, for the Corps' failure to adequately comply with NEPA and the APA prior to approval.

## JURISDICTION

4.      This Court has jurisdiction over the claims set forth in this Complaint pursuant to 16 U.S.C. § 1540(g)(1) (ESA citizen suit), 28 U.S.C. § 1331 (civil action arising under the laws of the United States), 28 U.S.C. § 2201 (declaratory relief), 28

U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 702, 706 (APA). The relief sought is authorized by 16 U.S.C. § 1540(g), 5 U.S.C. § 706, and 28 U.S.C. §§ 2201(a), 2202.

5.     This Court has subject matter jurisdiction over the Corps' violations of the ESA pursuant to 16 U.S.C. § 1540(g)(1), which authorizes citizens to bring suit to enjoin any person that is in violation of the ESA. As required by the ESA's citizen suit provision, 16 U.S.C. § 1540(g)(2)(a)(i), Coastkeeper provided the Corps and the required federal wildlife management agencies with written notice of the ESA violations alleged herein by letters dated November 16, 2022 and January 5, 2023. More than 60 days have passed since Coastkeeper provided its notice of intent to sue.

6.     This Court has personal jurisdiction over the Corps because the Corps is an agency of the federal government operating within the United States. The Corps also maintains a district office in California.

7.     Plaintiffs and their members are aggrieved by the Corps' failures to comply with the law. The Corps' lack of ESA consultation concerning the harm it is causing to ESA-listed species means that the Corps' decisions are causing harm to those species without the ESA's mandatory substantive and procedural protections. The Corps' decision to take these actions without adequately complying with NEPA was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law and prevented the Corps from adequately assessing and mitigating the effects of its decisions on the environment and from benefitting from the public's input on its decisions. Coastkeeper and its members visit waters and lands impacted by the Corps' decisions for wildlife viewing; scientific observation; educational study; aesthetic enjoyment; spiritual contemplation; recreation, including boating, swimming, kayaking, fishing, and photography; and other actions. The Corps' failures to comply with the law have harmed, impaired, and diminished, and will continue to harm, impair, and diminish, Coastkeepers' and its members' use and enjoyment of these areas.

## VENUE

8.     Venue in the United States District for the Central District of California is proper under 28 U.S.C. § 1391(e)(1)(C) because the Defendants are officers or agencies of the United States and one or more plaintiffs reside in the district within the meaning of 28 U.S.C. § 1391(d).

## INTRADISTRICT ASSIGNMENT

9.     Assignment to the Southern Division is appropriate because Coastkeeper has its primary place of business in Orange County.

## THE PARTIES

10.     Plaintiff ORANGE COUNTY COASTKEEPER is a non-profit environmental organization with the mission to protect swimmable, drinkable, fishable water and promote watershed resilience throughout our region. Coastkeeper represents thousands of members, including Orange County residents and strong supporters of environmental quality and public health. Coastkeeper members hike, bike, kayak, paddleboard, surf, boat, swim, birdwatch, wildlife watch, observe and restore native plants, fish, and wildlife, and conduct other activities within Newport Bay, offshore Newport Beach, and within the greater Project area. In addition, Coastkeeper conducts a variety of marine habitat restoration and education projects within Newport Bay, including restoration of native eelgrass and oysters. Coastkeeper representatives are also part of the Southern California Caulerpa Action Team ("SCCAT"), which is actively responding to a *Caulerpa prolifera* infestation in Lower Newport Bay, including in the immediate vicinity of the Project.

11.     Coastkeeper has one or more members who reside in, explore, and/or recreate in areas impacted by the Project and related actions. Many of Coastkeeper's members will suffer recreational, aesthetic, and/or other environmental injuries due to the Corps' final actions, specifically, the Corps' Project and related actions.

12.     Coastkeeper brings this action on its own behalf and on behalf of its adversely affected members and staff. Coastkeeper and its members and staff have been, are being, and will continue to be injured by the Corps' failure to comply with the law, and a favorable outcome of this litigation will redress those injuries.

13.     Defendant U.S. ARMY CORPS OF ENGINEERS is an agency of the United States Government that, *inter alia*, implements various public works projects and exercises regulatory authority under the Clean Water Act ("CWA") and other statutes. The Corps issued the Final EA and FONSI, set forth criteria under which the Project will be carried out, will carry out dredging actions under the Project, and has taken various other actions related to the Project that have caused various threats to ESA-listed species and the environment in the Project area.

14.     Defendant LIEUTENANT GENERAL SCOTT A. SPELLMON is the Chief of Engineers and Commanding General of the Corps and, in that capacity, is the federal official with responsibility for his and other Corps officials' actions and/or inactions challenged in this complaint. Lieutenant General Spellmon is sued in his official capacity.

## LEGAL BACKGROUND

### I.    Overview of the Endangered Species Act

15.     The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). The ESA declares that endangered and threatened species are of "esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." 16 U.S.C. § 1531(a)(3). Accordingly, the ESA's purpose is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species…." 16 U.S.C. § 1531(b). To accomplish this purpose, the ESA includes both substantive and procedural provisions that are designed to protect and recover imperiled species. To meet these obligations, the ESA provides that "endangered

species [have] priority over the 'primary missions' of federal agencies." *Tenn. Valley Auth.*, 437 U.S. at 185. To this end, the ESA directs all federal agencies to work to conserve endangered and threatened species and to use their authorities to further the purposes of the ESA. *See* 16 U.S.C. §§ 1531(c)(1), 1536(a).

16. The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532(3).

17. ESA section 4 requires the National Marine Fisheries Service ("NMFS") and the U.S. Fish and Wildlife Service ("FWS") to protect imperiled species by listing them as either "endangered" or "threatened" and to designate their "critical habitat." 16 U.S.C. § 1533.

18. ESA section 7(a)(2) requires that each federal agency (the "action agency"), in consultation with the NMFS and/or FWS,[1] ensure "that any action authorized, funded, or carried out" by the agency "is not likely to jeopardize the continued existence of" listed species or result in the destruction or adverse modification of critical habitat of such species. 16 U.S.C. § 1536(a)(2).

19. ESA section 7(a)(2) also establishes a procedural duty in the form of an interagency consultation process to assist federal agencies in complying with their duty to ensure against jeopardy to listed species or destruction or adverse modification of critical habitat. An agency must initiate consultation under section 7 with NMFS and/or FWS

---

[1] The ESA delegates responsibility for section 7 consultation with action agencies to two cabinet-level Secretaries, Interior and Commerce. 16 U.S.C. §§ 1532(15), 1536(a). The Secretary of the Interior has sub-delegated authority to FWS, which has primary responsibility for terrestrial species and freshwater species of fish, and the Secretary of Commerce has sub-delegated authority to NMFS, which has primary responsibility for marine species and anadromous fish.

*before* it takes an action that "may affect" a listed species. 50 C.F.R. § 402.14(a) (action agency must "review its actions at the earliest possible time to determine whether any action *may affect* listed species or critical habitat.") (emphasis added). The scope of "agency action" subject to consultation is construed broadly. *See* 50 C.F.R. § 402.02 (defining "agency action"); *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054–55 (9th Cir. 1985). This includes, *inter alia*, "granting of … permits" and "actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02(c), (d).

20.     Where a discretionary agency action "affirmatively authorized, funded, or carried out the underlying activity" and/or "set forth criteria" for future activity, that action is subject to the ESA's requirements. *Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 884-85 (9th Cir. 2022).

21.     If any ESA-listed species may be present in the action area, the action agency must prepare a Biological Assessment ("BA"). *See* 16 U.S.C. § 1536(c)(1). The BA must "evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action and is used in determining whether formal consultation or a conference is necessary." 50 C.F.R. § 402.12(a).

22.     If the action agency determines that its action may affect, but is not likely to adversely affect, a proposed or listed species or its proposed or designated critical habitat, it may engage in "informal consultation" with NMFS and/or FWS. *See* 50 C.F.R. §§ 402.13(a), 402.14(b)(1). If, as a result of informal consultation, NMFS and/or FWS issues a written "concurrence" to the action agency that its proposed action is not likely to adversely affect a listed species or its critical habitat, the consultation process ends. *See id.* However, if either agency believes that adverse effects are possible, the agencies must engage in formal consultation.

23.     After formal consultation, NMFS and/or FWS issues a Biological Opinion ("BO") to explain whether the agency action is likely to "jeopardize" any ESA-listed

species' existence or "result in the destruction or adverse modification" of an ESA-listed species' critical habitat. 16 U.S.C. § 1536(a)(2). The BO must include a summary of the information on which it is based and must adequately detail and assess how the proposed action affects listed species and their critical habitat. 50 C.F.R. § 402.14(h). The BO must also include an evaluation of the "cumulative effects on the listed species or critical habitat." 50 C.F.R. § 402.14(g)(3).

24.    If the action is likely to cause jeopardy or destruction or adverse modification of critical habitat, then the BO shall specify reasonable and prudent alternatives ("RPAs") that avoid jeopardy or adverse modification of critical habitat. *See* 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3). If NMFS and/or FWS concludes that the action or the action as amended by the RPAs will not cause jeopardy, it will issue an incidental take statement ("ITS") that specifies "the impact, i.e., the amount or extent, of . . . incidental taking" that may occur. *See* 50 C.F.R. § 402.14(i)(1). This ITS must also include reasonable and prudent measures ("RPMs") necessary or appropriate to minimize the impact of the action on listed species and critical habitat. *See* 50 C.F.R. § 402.14(i)(1)(ii).

25.    However, the action agency's and NMFS and/or FWS's consultation duties do not end with the issuance of a BO. The action agency, FWS, and NMFS are all required to reinitiate consultation "where discretionary Federal involvement or control over the action has been retained or is authorized by law . . ." and:

(a) If the amount or extent of taking specified in the incidental take statement is exceeded;

(b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;

(c) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or

(d) If a new species is listed or critical habitat designated that may be affected by the identified action.

50 C.F.R. § 402.16. This is consistent with the agencies' ongoing substantive duties to ensure that their actions do not cause jeopardy to ESA-listed species or destruction or adverse modification of their critical habitat.

26.     Similarly, as a result of the agencies' substantive ESA section 7(a)(2) duties to ensure that their actions do not cause jeopardy or destruction or adverse modifications of critical habitat, the agencies must avoid taking actions during the pendency of consultation that risk violating that substantive duty and must take actions that ensure compliance with those duties. *See, e.g., Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1034-35 (9th Cir. 2005).

27.     Further, once consultation is initiated or reinitiated, ESA section 7(d) prohibits the agency from "mak[ing] any irreversible or irretrievable commitment of resources" toward a project that would "foreclos[e] the formulation or implementation of any reasonable and prudent alternative measures . . ." 16 U.S.C. § 1536(d). The section 7(d) prohibition "is in force during the consultation process and continues until the requirements of Section 7(a)(2) are satisfied." 50 C.F.R. § 402.09. This section 7(d) duty is in addition to the substantive section 7(a)(2) duties that the agency has during the pendency of consultation.

28.     The ESA's goals cannot be met where the action agencies, NMFS, and FWS fail to comply with the ESA's procedural and substantive requirements. Compliance is critical to conserve endangered and threatened species and the habitats they rely on. Therefore, failure to consult where the ESA requires consultation and to take other actions necessary to conserve listed species and their designated critical habitat are serious violations of the ESA.

29.     The ESA's citizen suit provision authorizes citizens to commence suit against, *inter alia*, federal agencies that are alleged to be in violation of any ESA provision. 16 U.S.C. § 1540(g)(1)(A).

**II.     Overview of the National Environmental Policy Act**

30.     One of the core goals of NEPA is to "promote efforts which will prevent or eliminate damage to the environment…" 42 U.S.C. § 4321. As such, NEPA directs all federal agencies to assess the environmental impacts of proposed actions that may significantly affect the quality of the human environment.

31.     An agency cannot avoid consideration of the environmental impacts of a proposed action. *See* 42 U.S.C. § 4332(2)(C) (requiring an evaluation of "any adverse environmental effects which cannot be avoided should the proposal be implemented," which must examine "the environmental impact of the proposed action" "to the fullest extent possible"); 42 U.S.C. § 4332(2)(F) (requiring agencies to consider the "worldwide and long-range character of environmental problems"); *Kleppe v. Sierra Club*, 427 U.S. 390, 409-10 (1976) (noting Congress' mandate that agencies use "all practicable means" to "assure consideration of the environmental impact of their actions in decisionmaking," requires consideration of cumulative effects) (citations omitted); *City of Davis v. Coleman*, 521 F.2d 661, 676-77 (9th Cir. 1975) (outlining the statutory obligation to consider the indirect effects of agency actions).

32.     The Council on Environmental Quality ("CEQ") promulgated uniform regulations to implement NEPA that are binding on all federal agencies. *See* 42 U.S.C. §§ 4342, 4344; 40 C.F.R. §§ 1500-1508

33.     The Corps has its own NEPA regulations, codified at 33 C.F.R. part 230, which the Corps uses in conjunction with the CEQ regulations.

34.     NEPA requires all federal agencies to prepare a "detailed statement" assessing the environmental impacts of all "major Federal actions significantly affecting

the quality of the human environment." 42 U.S.C. § 4332(C). This statement is known as an Environmental Impact Statement ("EIS").

35.     The Supreme Court has found that the preparation of an EIS serves NEPA's "action-forcing" purposes in two primary ways: "It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

36.     A major Federal action includes "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as Federal and federally assisted activities." 40 C.F.R. § 1508.1(q)(3)(iv).

37.     The NEPA regulations define human environment "comprehensively" as "the natural and physical environment and the relationship of present and future generations of Americans with that environment." 40 C.F.R. § 1508.1(m).

38.     If the proposed action is not likely to have significant effects or if the agency is uncertain whether a full EIS is necessary, the agency must prepare an environmental assessment ("EA") to determine whether the effects of the proposed action are significant enough to trigger an EIS. 40 C.F.R. §§ 1501.5(a), 1501.3(a).

39.     An EA must discuss the purpose and need for the proposed action, alternatives to the proposed action, the environmental impacts of the proposed action and alternatives, and a list of agencies and persons consulted. 40 C.F.R. § 1501.5(c)(2). And, "for alternatives that the agency eliminated from detailed study, [the agency must] briefly discuss the reason for their elimination." 40 C.F.R. § 1502.14(a).

40.     After conducting an EA, if an agency determines that the proposed action will not have a significant effect on the human environment and that an EIS is not

warranted, then the agency must prepare a FONSI explaining the reasons why an action will not have a significant effect on the human environment. 40 C.F.R. §§ 1508.1(h), (l).

41.    "Because the very important decision whether to prepare an EIS is based solely on the EA, the EA is fundamental to the decision-making process." *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000).

42.    When preparing an EA, an agency must take a "hard look" at the environmental effects, including "considering all foreseeable direct and indirect impacts." *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002).

43.    An agency's decision to not prepare an EIS must be based on "a convincing statement of reasons why potential effects are insignificant." *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988) (citation omitted).

44.    An EA thus must "provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." 40 C.F.R. § 1501.5(c)(1); *Anderson v. Evans*, 371 F.3d 475, 488 (9th Cir. 2004).

45.    The NEPA regulations define effects or impacts as "changes to the human environment from the proposed action or alternatives that are reasonably foreseeable," including direct effects, indirect effects, and cumulative effects whether those effects are "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effects will be beneficial." 40 C.F.R. § 1508.1(g).

46.    To analyze the potentially affected environment, the agency must establish baseline conditions before the project begins, otherwise "there is simply no way to determine what effect the project will have on the environment and, consequently, no way to comply with NEPA." *Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1190 (9th Cir. 2019) (citations and internal quotations omitted).

COMPLAINT FOR DECLARATORY                    11
AND INJUNCTIVE RELIEF

47.     When determining the degree of the effects, agencies should consider short- and long-term effects, beneficial and adverse effects, effects on public health and safety, and effects that violate the laws protecting the environment. 40 C.F.R. § 1501.3(b)(2).

48.     Agencies must consider the effects of connected actions that are closely related to the proposed action such that they should be discussed in the same document as the proposed action. 40 C.F.R. § 1501.3(b); 40 C.F.R. § 1501.9(e)(1). Actions are connected if they: "(i) Automatically trigger other actions that may require environmental impact statements; (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously; or (iii) Are interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1501.9(e)(1).

49.     To determine whether the effects of a proposed action are significant, agencies must "analyze the potentially affected environment and the degree of the effects of the action." 40 C.F.R. § 1501.3(b).

50.     "In considering the potentially affected environment, agencies should consider, as appropriate to the specific action, the affected area (national, regional, or local) and its resources, such as listed species and designated critical habitat under the [ESA]. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend only upon the effects in the local area." 40 C.F.R. § 1501.3(b)(1).

51.     An agency fails to take a hard look at the environmental impacts where significant questions "were ignored or, at best, shunted aside with mere conclusory statements." *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1179 (9th Cir. 1982). An agency cannot rely on mere "conclusory assertions that an activity will have only an insignificant impact on the environment." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864 (9th Cir. 2005).

52.     The agency must also "[i]nclude appropriate mitigation measures not already included in the proposed action or alternatives." 40 C.F.R. § 1502.14(e).

53.     Mitigation is defined as "measures that avoid, minimize, or compensate for effects caused by a proposed action or alternatives as described in an environmental document or record of decision and that have a nexus to those effects." 40 C.F.R. § 1508.1(s).

54.     If an agency's FONSI is based on mitigation, the mitigated FONSI must "state any enforceable mitigation requirements or commitments that will be undertaken to avoid significant impacts." 40 C.F.R. § 1501.6(c).

55.     A FONSI relying on mitigation must contain strong evidence that mitigation will be effective. Simply listing potential mitigation measures, without engaging in actual analysis of the effectiveness of those measures, is "insufficient to demonstrate that the mitigation measures would render the environmental impact so minor as to not warrant an EIS." *See Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 734 (9th Cir. 2001), *abrogated in part on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010) (finding that "the proposed mitigation measures must be developed to a reasonable degree" and rejecting agency attempt to "act first and study [mitigation measures] later"). Agencies are required to discuss mitigation beyond "a perfunctory description or mere listing of mitigation measures, without supporting analytical data." *Id.* at 735.

56.     A federal agency cannot rely on a non-NEPA document, especially ones prepared by non-Federal government entities, to satisfy its obligations under NEPA. *S. Fork Band Council of W. Shoshone v. U.S. Dep't of Interior*, 588 F.3d 718, 726 (9th Cir. 2009). Further, "[t]he mere existence of an entirely separate draft EIS, discussing a similar issue with regard to a different project, but without any indication that it discussed the specific environmental impacts at issue, cannot satisfy [NEPA]." *Id.*

1

### III.    Overview of the APA

2    57.    APA section 702 provides a private cause of action to any person "suffering

3 legal wrong because of agency action, or adversely affected or aggrieved by agency

4 action within the meaning of a relevant statute…" 5 U.S.C. § 702.

5    58.    Only final agency actions are reviewable under the APA. 5 U.S.C. § 704.

6 The Corps' approval of the Project via the Final EA and FONSI and the Corps'

7 permitting of construction of the related CAD site are "final agency actions" for APA

8 purposes.

9    59.    Under the APA, a court must "hold unlawful and set aside agency actions,

10 findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

11 otherwise not in accordance with law;" "in excess of statutory jurisdiction, authority, or

12 limitations, or short of statutory right;" or "without observance of procedure required by

13 law." 5 U.S.C. § 706(2)(A), (C), (D).

14    60.    The APA applies to review of Coastkeeper's NEPA claims, but not its ESA

15 claims, review of which is under the ESA citizen suit provision.

16    ### FACTUAL BACKGROUND

17    61.    Lower Newport Bay and the greater Project area are important ecological

18 areas serving as habitat for numerous ESA-listed species, including: California least tern

19 (*Sterna antillarum browni*) – endangered; western snowy plover (*Charadrius*

20 *alexandrinus nivosus*) – threatened; green sea turtle (*Chelonia mydas*) – threatened;

21 leatherback sea turtle (*Dermochelys coriacea*) – endangered; olive ridley sea turtle

22 (*Lepidochelys olivacea*) – endangered; Guadalupe fur seal (*Arctocephalus townsendi*) –

23 threatened; sei whale (*Balaenoptera borealis*) – endangered; blue whale (*Balaenoptera*

24 *musculus*) – endangered; fin whale (*Balaenoptera physalus*) – endangered;; humpback

25 whale (*Megaptera novaeangliae*) – endangered; orca (*Orcinus orca*) – endangered; sperm

26 whale (*Physeter catodon*) – endangered; false killer whale (*Pseudorca crassidens*) –

27 endangered; Hawksbill sea turtle (*Eretmochelys imbricata*) – endangered; and

Loggerhead sea turtle (*Caretta caretta*) - endangered (collectively the "Threatened and Endangered Species") and to many more unlisted species of fish, birds, and marine mammals.

62. Lower Newport Bay is on the CWA section 303(d) list of impaired/water quality limited waterbodies for chlordane, copper, nutrients, chlorpyrifos, dichlorodiphenyltrichloroethane ("DDT"), indicator bacteria, polychlorinated biphenyls ("PCBs"), sediment, and toxicity, meaning Lower Newport Bay and its sediments are significantly impaired by these pollutants.

63. Additionally, the California State Water Resources Control Board has published a proposed revision to this CWA section 303(d) list that proposes retaining all of the above pollutants from the current 303(d) list and adding the pesticide dieldrin.

64. Lower Newport Bay is also the site of extensive additional legacy environmental pollution in the form of other contaminants.

65. Much of this pollution is interred in the sediments that make up the shoals in the federal navigation channel and elsewhere in Lower Newport Bay.

66. Lower Newport Bay is also the site of an ongoing infestation by the invasive *Caulerpa prolifera*, a non-native species of marine algae. This marine alga, and other species of *Caulerpa*, can quickly colonize new areas when even relatively small parts of the plant are introduced to new places. *Caulerpa* can then take over those environments, pushing out native species and causing extensive ecological harm.

67. Upon discovery of the *Caulerpa* infestation, the SCCAT was re-formed, after having addressed a previous *Caulerpa* infestation in Southern California and disbanding, to address the infestation. SCCAT is a multi-agency group intended to evaluate and eradicate the recent infestation by *Caulerpa prolifera* in Lower Newport Bay. In service of this goal, SCCAT has created various plans, protocols, and other guidance to avoid further spread of *Caulerpa* and to eradicate its present infestation. Coastkeeper is a member of SCCAT.

68.    The Project is one of several connected dredging actions in Lower Newport Bay that the Corps has authorized, permitted, and/or carried out since 2021.

69.    To implement the Project, the Corps intends to dredge approximately 926,000 cubic yards of sediment and other material from the Lower Newport Bay federal navigation channels. This is enough material to cover an entire football field, including the end zones, to a depth of over 434 feet—taller than a 40-story building.

70.    The Corps plans to dump 784,000 cubic yards of this material at the LA-3 Ocean Dredged Material Disposal Site ("LA-3 ODMDS"); dump 119,000 cubic yards at the proposed CAD site, to be located within Lower Newport Bay; and use the final 23,000 cubic yards of material as an interim cap for the CAD.

71.    The CAD is effectively a large hole that the City of Newport is digging, with permit approval from the Corps under CWA section 404 and section 10 of the Rivers and Harbors Act of 1899, to serve as a dumping ground for the dredged material from the Project that is not suitable under federal Environmental Protection Agency ("EPA") requirements for ocean dumping, established by EPA's ocean dumping regulations set forth at 40 C.F.R. Part 227.

72.    EPA issued this CAD permit on January 27, 2023.

73.    Specifically, the Project material that the Corps plans to dump in the CAD is too heavily polluted with PCBs and mercury to be lawfully dumped at LA-3 ODMDS consistent with EPA's ocean dumping regulations set forth at 40 C.F.R. Part 227.

74.    After filling the CAD with this polluted material, the Corps intends to cover the CAD with a thin layer of material as a cap, to be supplemented by a somewhat thicker cap of material at some point in the future.

75.    However, the dredged material to be dumped at both the CAD and LA-3 ODMDS is also excessively polluted with metals (including metals other than mercury), organotins (including butyltin, dibutyltin, tributyltin, and tetrabutyltin, which are potent biocides used to prevent growth of marine organisms on the hulls of ships), pesticides

(including DDT (exceeding appropriate guidance criteria for excessively contaminated marine sediments such as Effects Range Median ("ERM")[2] in all samples except Entrance Channel)); chlordane (exceeding ERM in all samples except Entrance Channel and Main Channel North 1); dieldrin; and bifenthrin, cyfluthrin, cypermethrin, fluvalinate, and permethrin, which are members of the pyrethroid family of synthetic pesticides), and polycyclic aromatic hydrocarbons ("PAHs"), and PCBs.

76.     In March 2022, the Corps proposed the Project, through the Draft Environmental Assessment for Lower Newport Bay Maintenance Dredging Project ("Draft EA"), to remove shoals that had built up over time in the Lower Newport Bay federal navigation channels and to dispose of the dredged material at the CAD and LA-3 ODMDS.

77.     The Draft EA set a comment deadline of April 14, 2022, and Coastkeeper timely submitted comments on the Draft EA.

78.     The Corps, via email, confirmed receipt of Coastkeeper's comments on the Draft EA on April 18, 2022.

---

[2] ERM is a measure of toxicity in marine environments that is derived from research on this topic. Values above the ERM indicate that toxic effects of the pollutants would generally or always be observed in the environment where the above-ERM levels of pollutants are present. ERMs are one set of criteria appropriately used by regulatory agencies, including EPA and the Corps, to evaluate the extent to which marine sediment contamination poses environmental risk to aquatic life and/or human health. Numerous federal and state regulatory agencies and academic researchers have set other relevant and appropriate criteria. Such criteria include, for example, the National Oceanic and Atmospheric Administration's Screening Quick Reference Tables ("SQRT") (published at https://repository.library.noaa.gov/view/noaa/9327) and the Washington Department of Ecology Sediment Management Standards (published at https://www.epa.gov/sites/default/files/2014-12/documents/wa-chapter173-204.pdf). The sediments in issue are extensively contaminated with levels of pollutants exceeding such criteria.

79.     Coastkeeper informed the Corps that its analysis of the environmental harm caused by the Project was deficient in numerous respects.

80.     Despite previously admitting that the Project will likely affect, indeed likely adversely affect, at least some of the Threatened and Endangered Species, and despite Coastkeeper's repeated requests that it do so, the Corps refused to consult with FWS and/or NMFS under the ESA on the effects of the Project. In the Draft EA, the Corps, in contrast to previous statements and to analysis in the Draft EA itself, determined that the Project will have no effect at all on any ESA-listed species.

81.     NMFS further refuted the Corps' unilateral "no effect" determination in its comments on the Draft EA, stating that occurrence of green sea turtles, the only ESA-listed species under NMFS's jurisdiction that the Corps admitted in its NEPA analysis was present in the Project area, was likely more extensive in the Project area than the Corps stated, and recognizing a likelihood for direct and/or indirect adverse effects to green sea turtles from the Project.[3]

82.     NMFS recommended that the Corps "engage in [ESA section 7] consultation with NMFS Protected Resources Division in Long Beach, California, for assistance with ESA compliance," to assess the extent of threats, and to determine any RPMs needed to minimize harm to ESA-listed species.

---

[3] Though NMFS briefly mentioned likely harm to this ESA-listed species under its jurisdiction in its comments on the Draft EA, this was in no way an ESA consultation. These comments were in response to the Corps' separate Essential Fish Habitat ("EFH") obligations under the 1996 amendments to the Magnuson-Stevens Fishery Conservation and Management Act. The Corps never requested or entered into ESA consultation with NMFS and no BA and/or BO ever issued. Notably, the Corps also did not discuss the Project with, request any comments from, or engage in ESA consultation with FWS, despite that California least tern and western snowy plover, ESA-listed species within FWS' jurisdiction, are likely to be harmed by the Project.

83.    The Corps did not engage in such requested consultation and explicitly rejected NMFS's consultation request.

84.    The Corps instead, in the Draft EA and Final EA, provided inadequate, conclusory, and incorrect assessment of effects of the Project to green sea turtles and, to an even lesser extent, the California least tern.

85.    The Corps did not even mention potential harm to the other 12 Threatened and Endangered Species listed above that are present at various times in Lower Newport Bay and the greater Project area.

86.    The Corps has approved and funded the Project (as reflected in the FONSI and other Corps documents and communications) and set forth criteria for implementing the Project in the Final EA and FONSI and, on information and belief, has commenced carrying out the Project by taking various affirmative actions necessary for Project implementation. Accordingly, the Corps has undertaken and is undertaking an agency action which may affect species projected under the ESA. *See, e.g.*, *EDC v. BOEM*, 36 F.4th at 884-85.

87.    Thus, the Corps' failure to consult on the effects of the Project on ESA-listed species was a violation of the Corps' procedural and substantive duties under the ESA.

88.    These failures to adequately analyze the effects of the Project on ESA-listed species, including the Corps' failure to consider all sighting data for the Threatened and Endangered Species in the Project area, are also violations of NEPA as they prevented the Corps from accurately assessing the environmental effects of its major federal action significantly affecting the quality of the human environment—approving the Project through the Final EA and FONSI.

89.    The Corps' decision in the Final EA to prepare an FONSI rather than a full EIS was arbitrary and capricious for a variety of reasons. For example, the Project will have significant environmental effects because:

- The Project will adversely affect the populations of Threatened and Endangered Species present in the Project area and cause the loss or disturbance of their habitat there (which was the Corps' criterion for significance of effect to "Marine Resources");

- In addition to the harm caused to the Threatened and Endangered Species and their habitat, the Corps' violations of the ESA are an independent significant environmental effect;

- The material that will be dredged and dumped under the Project contains high levels of pollutants, the re-suspension, absorption, bioaccumulation, and biomagnicifaction of which will be harmful to additional species of fish, birds, and wildlife, in addition to the Threatened and Endangered Species;

- The material that will be dredged and dumped under the Project contains high levels of pollutants that will be harmful to water quality in the Project area;

- The volume of material being dredged and dumped under the Project is very large;

- There is significant uncertainty as to the effectiveness of the CAD to contain the polluted material being dumped there;

- There is a significant potential for the cap layer on the CAD to fail, especially when only the thinner interim cap is present, which would result in further suspension of the harmful sediments interred therein in the waters of Lower Newport Bay and surrounding areas; and

- The active infestation by the highly invasive *Caulerpa prolifera* alga in Lower Newport Bay and efforts to prevent further spread will be hampered by the Project, which poses significant risks of spreading *Caulerpa* throughout Lower Newport Bay and into other coastal areas in and near the Project area.

COMPLAINT FOR DECLARATORY                    20
AND INJUNCTIVE RELIEF

90.     Even if the Corps' decision to decline preparation of an EIS were correct, which it was not, the Corps' environmental analysis in the Final EA and FONSI inadequately considered various environmental effects of the Project.

91.     The Corps inadequately considered the extent of *Caulerpa prolifera* infestation and the likelihood that the Project would result in further *Caulerpa* spread, with potentially disastrous results.

92.     The Corps' proposed *Caulerpa* survey and control measures are insufficient to control against this threat and are inconsistent with relevant expert guidance and protocols.

93.     Indeed, the Corps does not even treat the *Caulerpa* survey and control protocols discussed in the Final EA, which are inconsistent with expert guidance and protocols, as final and/or mandatory, leaving the methods and requirements for survey and control of *Caulerpa*, upon which the Corps relies for its effects analysis, undefined and fundamentally uncertain. This is patently insufficient to address the serious *Caulerpa* threat in Lower Newport Bay.

94.     The Corps also failed to adequately analyze the effects on the water column caused by the dredging and disposal of the contaminated material. The Corps generally stated it would use certain mitigation measures, often only "(if feasible)," but its discussion lacked any sort of binding criteria or actions that it would follow and how effective it anticipated its actions would be. The Corps also did not effectively analyze the effects of the sediment becoming suspended in the water column if its vague control measures failed.

95.     This is important because suspending this sediment will not only result in turbidity and reduction in light and dissolved oxygen, but it will also suspend the pollutants that are contained in the sediment. As previously discussed, Lower Newport Bay and the broader Project Area are important recreation areas and are also important habitat to many wildlife species, including the Threatened and Endangered Species.

COMPLAINT FOR DECLARATORY              21
AND INJUNCTIVE RELIEF

When these pollutants are released into the water column they can result in various harms including intake via direct contact and bioaccumulation and biomagnification, whereby prey species take these contaminants in and they reach higher concentrations in species that are further up the food chain, resulting in increasingly severe effects on those species as pollutant loads increase.

96.    For example, the Corps' Final EA and FONSI entirely ignored these effects on the Threatened or Endangered Species, for which the Corps focused its effects analysis only on green sea turtles, and to a lesser extent California least terns, and generally only looked at threats from ship strikes and noise/direct impact with dredging equipment. The Corps' Final EA and FONSI arbitrarily downplayed the Project's interference with prey species and lacked discussion of bioaccumulation and biomagnification of pollutants in the Threatened and Endangered Species or other species.

97.    Further, with regard to dumping contaminated material at the CAD, the Corps' Final EA and FONSI only considered harm in the form of increased turbidity and decreased dissolved oxygen in the water column nearby. However, these effects are caused by the re-suspension of the material that is so polluted that it cannot be dumped at the LA-3 ODMDS. Re-suspension of this material will also necessarily result in a second re-suspension of those pollutants, after their first re-suspension during dredging, which will then lead to those pollutants being ingested and subsequently being subject to bioaccumulation and biomagnification by wildlife in Lower Newport Bay.

98.    The Corps also relied in its Final EA and FONSI on sediment pollution data that was subject to numerous quality assurance/quality control problems that render reliance on that data for assessment of environmental harm from the Project arbitrary and capricious.

99.    The Corps' Final EA and FONSI failed to adequately analyze the effects of construction of the CAD, which includes significant additional dredging and dumping of contaminated material.

100.    The Corps' Final EA and FONSI failed to adequately analyze likely failure of the cap at the CAD to contain the contaminated sediment it intends to place there.

101.    In its Final EA and FONSI, the Corps also stated that it would test monthly around the CAD for mercury levels, but the Corps does not say it will ever test for PCBs or any of the other many pollutants that have been identified in the dredged material.

102.    In its Final EA and FONSI, the Corps characterizes the material it will dump at LA-3 ODMDS as "clean," a false statement that ignores the many pollutants that are contained in this material.

103.    The Corps' Final EA and FONSI failed to adequately consider the propriety of remediating the contaminated sediment from the Project before dumping it in the marine environment or otherwise disposing of it.

104.    This is part of a broader problem whereby the Corps failed to properly analyze appropriate mitigation measures for the Project.

105.    For example, as "mitigation" for its reduction in eelgrass under the Project, the Corps indicated in its Final EA and FONSI that it was relying on mitigation measures it already carried out as mitigation for previous dredging. The Corps thus attempts to double-count its prior mitigation and to skirt providing any additional eelgrass mitigation for the Project's impacts.

106.    In its comments on the Draft EA, NMFS also suggested certain mitigation for the Corps' negative impacts to essential fish habitat, including certain *Caulerpa* control mitigation funding. On information and belief, the Corps arbitrarily rejected this proposal.

107.    The Corps has failed to adopt and does not plan to implement adequate controls to avoid release of pollution-contaminated sediment into the water column that

will result from the Project's dredging and dumping operations. Dredging and dumping will inherently disturb contaminated sediment and suspend that contaminated sediment in the water column, and the Corps' Final EA and FONSI only provided vague, inadequate, and uncertain control mechanisms to prevent such disturbance and suspension.

108.   The Corps' Final EA and FONSI also arbitrarily declined to address the harms caused by the Project and the measures necessary to mitigate that harm. For example, the Final EA stated the Corps would consider newly located eelgrass and changes in amount of dredged material outside of the NEPA process. This leaves consideration of the effects of these changes out of any NEPA analysis, shuts the public out, and prevents the Corps from making a fully informed decision as required by NEPA.

109.   The Corps' analysis in its Final EA and FONSI improperly segments the Project by ignoring the impacts of creating the CAD, an action whose utility is dependent on its use as a receptacle for material dredged as part of the Project, and the previous 2021 dredging of Lower Newport Bay, which, properly understood, is connected to the instant Project.

110.   As a result, the Corps' NEPA analysis does not consider the environmental effects of creating the CAD (which involves dredging and dumping of an additional 282,400 cubic yards of material) nor of the Lower Newport Bay dredging that the Corps carried out in 2021 (which involved dredging and dumping of an additional 129,000 cubic yards of material).

111.   The dredged and dumped material that the Corps' Final EA and FONSI has ignored is equivalent to over 44% of the dredged material volume that the Corps actually considered as part of the Final EA. This is a significant environmental impact that the Corps arbitrarily ignored.

112.   The Corps has failed to analyze a reasonable range of alternatives, as required by NEPA. The Corps' Final EA and FONSI only analyzed the preferred

alternative, an alternative that placed slightly more of the material in ocean disposal and did not utilize the CAD, and a no action alternative.

113.   The Corps has failed to analyze any alternative(s) that would involve treating contaminated material to reduce contaminant content before dumping the material in the marine environment.

114.   For example, the Corps failed to analyze any terrestrial or in-situ remediation alternatives such as soil washing, electrokinetic treatment, enhanced land farming, and microbial bioremediation, even though numerous studies have shown that such treatment methods can be environmentally preferable, cost-effective means of removing contaminants such as PCBs and heavy metals from contaminated marine sediments.

115.   The Corps did not consider any alternative(s) that would result in reduced dredging or land-based disposal of dredged sediments.

116.   The Corps did not consider any alternative(s) that would utilize locations for placement of dredged materials besides the CAD and/or LA-3 ODMDS.

117.   The Corps did not consider any alternatives that would utilize a thicker interim and/or permanent cap on the CAD, which could reduce the likelihood of cap failure and further dispersal of contaminated sediments.

118.   Coastkeeper informed the Corps that it was inappropriate to rush the NEPA process for the Project just to avoid having to re-test the relevant sediments, which the Corps utilized as a criterion for its Project, and Project-approval, timeline. Notably,  the Corps has concluded that the 2018 testing of samples of the sediments it intends to dredge under the Project remains valid if it initiates dredging "by January 2023." As a result of this conclusion, the Corps has been erroneously unwilling to take the time necessary to properly analyze the effects of its action before commencing dredging simply to avoid re-testing the sediments to be dredged and disposed of.

119.    Coastkeeper continued to request progress reports regarding the Corps' NEPA analysis for the Project and to request that the Corps consult on the effects of the Project under the ESA.

120.    On November 16, 2022, Coastkeeper sent a Sixty-Day Notice of Intent to Sue Under Section 7 of the ESA to the Corps ("First Notice Letter"). The First Notice Letter explained to the Corps that it was in violation of the ESA for failing to consult on the effects of the Project on the Threatened or Endangered Species.

121.    Despite having warning of its NEPA and ESA violations, the Corps completed the Final EA and signed the FONSI, without having consulted under the ESA, on November 27, 2022.

122.    The Corps did not notify Coastkeeper of the finalization and publication of the Final EA and FONSI despite numerous requests from Coastkeeper regarding progress updates for the documents.

123.    Only on January 3, 2023, after Coastkeeper asked for another update, was it made aware that the Final EA and FONSI had already been published, with no notification to Coastkeeper.

124.    The Final EA did not include Coastkeeper's comments or any discussion of Coastkeeper's comments or address the NEPA shortcomings that Coastkeeper had identified in those comments, despite the Final EA's representation that "[c]omments received during the public review period were considered during preparation of this Final EA. Copies of all comments received and responses to those comments can be found in Appendix H."

125.    When Coastkeeper asked the Corps about why it ignored Coastkeeper's comments, the Corps first denied that Coastkeeper had submitted comments.

126.    When Coastkeeper presented the Corps' email submission confirmation for Coastkeeper's comments, the Corps admitted that it had not considered or included those comments in its NEPA analysis.

# FIRST CLAIM FOR RELIEF
## The Corps' Procedural Violations of ESA Section 7(a)(2)
## Request for Declaratory and Injunctive Relief to Compel
## the Corps To Comply with 16 U.S.C. § 1536(a)(2)

127.   Coastkeeper repeats and incorporates by reference the allegations in the above paragraphs and all paragraphs of this Complaint.

128.   The ESA requires that federal agencies engage in interagency consultation under ESA section 7 to ensure that their agency actions are not likely to jeopardize the continued existence of endangered or threatened species or destroy or adversely modify those species' designated critical habitat. 16 U.S.C. § 1536(a)(2).

129.   The Corps has undertaken or commenced undertaking the discretionary agency action of "affirmatively authorize[ing], fund[ing], or carr[ying] out" the Project and/or has "set forth criteria" for the Project in the Final EA and FONSI, either of which is sufficient action for ESA purposes. *Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 884-85 (9th Cir. 2022).

130.   The Project is "an action [that] may affect listed species" under ESA section 7(a)(2) and its implementing regulations, 50 C.F.R. §§ 402.02(c) (defining actions under the ESA as including "actions directly or indirectly causing modifications to the land, water, or air"), because the Project will directly or indirectly cause modifications to the land, water, or air.

131.   The Corps failed to consult with FWS and NMFS prior to approving, funding, commencing, and/or setting criteria for implementation of the Project, as required by ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2), and 50 C.F.R. § 402.14.

132.   The Corps has thus violated these procedural requirements of the ESA and its implementing regulations by its ongoing failure to initiate and complete consultation with NMFS and FWS to ensure that the Project, an action that may affect ESA-listed species, does not jeopardize the ESA-listed species.

**SECOND CLAIM FOR RELIEF**
**The Corps' Substantive Violations of ESA Section 7(a)(2)**
**Request for Declaratory and Injunctive Relief to Compel**
**the Corps To Comply with 16 U.S.C. § 1536(a)(2)**

133.   Coastkeeper repeats and incorporates by reference the allegations in the above paragraphs and all paragraphs of this Complaint.

134.   The ESA requires that for any proposed action that may adversely affect a listed species, federal agencies have an independent ESA section 7(a)(2) substantive duty to ensure that any actions authorized, funded, or carried out by the agencies are not likely to jeopardize the continued existence of any threatened or endangered species. 16 U.S.C. § 1536(a)(2).

135.   The Corps has violated its substantive ESA section 7(a)(2) duties by approving, funding, and/or commencing the Project and setting forth criteria for the Project in the Final EA and FONSI, an action that is potentially jeopardizing the continued existence of ESA-listed species and that is continuing without any protections in the form of an ITS, RPAs, or RPMs. The Corps has failed to ensure that its actions do not have these effects in violation of the ESA. This applies to both the Corps' actions taken before engaging in consultation and to any actions taken after the Corps begins, but before it completes, consultation on the effects of the Project and the setting forth of criteria for the Project on listed species should the Corps belatedly begin consultation.

**THIRD CLAIM FOR RELIEF**
**The Corps' Violations of ESA Section 7(d)**
**Request for Declaratory and Injunctive Relief to Prevent the Corps from**
**Committing Resources Prior to Completion of Consultation in**
**Violation of 16 U.S.C. § 1536(d)**

136.   Coastkeeper repeats and incorporates by reference the allegations in the above paragraphs and all paragraphs of this Complaint.

137.   ESA section 7(d) prohibits the Corps from "mak[ing] any irreversible or irretrievable commitment of resources" that would "foreclos[e] the formulation or

COMPLAINT FOR DECLARATORY          28
AND INJUNCTIVE RELIEF

implementation of any reasonable and prudent alternative measures" after it has begun consultation. *See* 16 U.S.C. § 1536(d); 50 C.F.R. § 402.09.

138.   If the Corps has belatedly begun, or does belatedly begin, to consult on the effects of the Project and the setting forth of criteria for the Project on ESA-listed species, the Corps' ongoing activities approving, implementing, or otherwise supporting the Project that may harm ESA-listed species before completing that consultation violate the requirements of the ESA by constituting an irreversible or irretrievable commitment of resources.

**FOURTH CLAIM FOR RELIEF**
**The Corps' Violations of NEPA and the APA**
**Request for Declaratory Relief that the Corps' Determination that**
**the Project Will Not Have Significant Environmental Effects is Arbitrary**
**and Capricious, Vacatur of the Final EA/FONSI, and/or Injunctive Relief**
**Compelling the Corps To Prepare an EIS**

139.   Coastkeeper repeats and incorporates by reference the allegations in the above paragraphs and all paragraphs of this Complaint.

140.   NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

141.   The Project (including its related actions, such as the Corps' granting of the CAD construction permit and the 2021 dredging in Lower Newport Bay) is a major Federal action significantly affecting the quality of the human environment because, *inter alia*, the Project will harm ESA-listed species and their habitat in the Project area; the Corps violated the ESA in approving the Project; the dredging and dumping of the material under the Project threatens non-ESA-listed fish and wildlife in the Project area; the dredging and dumping of the material under the Project will degrade water quality in the Project area; the volume of material to be dredged under the Project is very large; there is significant uncertainty, and resultant environmental risk, regarding the ability of the CAD to prevent release of the material dumped there, especially when it is only

covered by the thin interim cap; and there is high potential for spread of invasive *Caulerpa prolifera* throughout the Project area and beyond as a result of the Project.

142. However, the Corps declined to prepare an EIS for the Project, erroneously determining that there would not be significant effects on the environment and instead preparing only the Final EA and FONSI.

143. The Corps' decision not to prepare an EIS was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under the APA, 5 U.S.C. § 706(2)(A).

**FIFTH CLAIM FOR RELIEF**
**The Corps' Violations of NEPA and the APA**
**Request for Declaratory Relief Holding that the Corps' Final EA and FONSI Is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law and is in Excess of the Corps' Statutory Authority and Vacatur of the Final EA and FONSI**

144. Coastkeeper repeats and incorporates by reference the allegations in the above paragraphs and all paragraphs of this Complaint.

145. As Coastkeeper described in its comments on the Draft EA, and this Complaint explains above, the Corps, with regard to the Project and related actions, failed to take a hard look at environmental effects; failed to adequately and correctly consider harm to the environment; failed to consider available, relevant data on environmental effects; relied on unreliable data in assessing environmental effects; failed to provide a convincing statement of reasons why environmental effects would not be significant; failed to adequately consider direct, indirect, and cumulative effects; failed to adequately engage the public in its decisionmaking; failed to consider a reasonable range of alternatives; failed to consider the environmental effects of connected actions; failed to adequately consider and commit to concrete, effective, and reasonable mitigation measures; failed to comply with the ESA; deferred consideration of known environmental impacts to some unknown time in the future outside of the NEPA process;

ignored Coastkeeper's comments on the Draft EA; and rushed through the NEPA process at the cost of objectivity, thoroughness, and adequate consideration of effects.

146. The Corps thus relied on factors that Congress has not intended the Corps to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the Corps, and based its decisions on reasons so implausible that they could not be ascribed to a difference in view or the product of agency expertise.

147. As a result, the Corps' actions approving the Project through issuance of the Final EA and FONSI and related actions (included approval of the CAD construction permit) are arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law within the meaning of the APA and are in excess of the Corps' statutory authority. 5 U.S.C. § 706(2)(A), (C).

## **PRAYER FOR RELIEF**

WHEREFORE, Coastkeeper seeks the following relief:

a. Declare that the Corps is in violation of the ESA's procedural requirements by failing to consult with NMFS and FWS as to the Project's effects on ESA-listed species;

b. Declare that the Corps is in violation of the ESA's substantive requirements by failing to ensure that the Project is not likely to jeopardize the continued existence of any ESA-listed species;

c. Declare, should the Corps belatedly begin consultation, that the Corps is in violation of the ESA by irreversibly or irretrievably committing its resources by taking actions implementing the Project during the pendency of consultation;

d. Declare that the Corps violated NEPA and the APA when it determined that no EIS was necessary for the Project (and related actions);

e. Declare that the Corps' issuance of the Final EA and FONSI was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

f.  Vacate the Final EA and FONSI for the Corps' violations of NEPA and the APA;

g.  Vacate the Corps' approval of the CAD construction permit for the Corps' violations of NEPA and the APA;

h.  Issue an injunction requiring the Corps to engage in ESA section 7 consultation with NMFS and FWS before approving, funding, and/or conducting the Project and setting criteria for the Project;

i.  Issue an injunction requiring the Corps to ensure that its approval, funding, and/or implementation of the Project and setting forth criteria for the Project does not jeopardize ESA-listed species;

j.  Issue an injunction prohibiting the Corps from taking actions that represent an irreversible or irretrievable commitment of resources during the pendency of consultation on the Project and the setting of criteria for the Project;

k.  Issue an injunction requiring the Corps to prepare an EIS for the Project (and related actions);

l.  Issue an injunction requiring the Corps to comply with its obligations under NEPA and the APA before approving, funding, and/or implementing the Project (and related actions), including before reissuing the Final EA and FONSI.

m.  Award Coastkeeper attorneys' fees and costs; and

n.  Issue any other relief, including injunctive relief, which this Court deems necessary, just, or proper or relief that Coastkeeper may subsequently request.

Dated: March 20, 2023                Respectfully submitted,

                            By:  _____

                                 Christopher Sproul
                                 *Attorney for Plaintiff*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                32